ACCURACY IN MEDIA, INC.,
Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

The Corporation For Public Broadcasting, the Public Broadcasting Service, the University of Maine, et al., Educational Broadcasting Corporation, Intervenors.

No. 74–1028.

United States Court of Appeals, District of Columbia Circuit.

Argued April 14, 1975.

Decided Oct. 16, 1975.

Daniel Manelli, Washington, D. C., for petitioner. Stanley H. Kamerow, Washington, D. C., was on the brief for petitioner. Thomas F. Rogan and Milton Mitchell, Silver Spring, also entered appearances for petitioner.

C. Grey Pash, Jr., Counsel, F.C.C., for respondents. Ashton R. Hardy, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, John E. Ingle, Counsel, F.C.C., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief for respondents. John W. Pettit, Gen. Counsel, F.C.C., at the time the record was filed, entered an appearance for respondents.

James L. McHugh, Jr., Washington, D. C., with whom Randolph J. May, Washington, D. C., was on the brief for intervenor, The Corporation for Public Broadcasting. Richard M. Schmidt, Jr., Washington, D. C., also entered an appearance for intervenor The Corporation for Public Broadcasting.

Theodore D. Frank, Washington, D. C., with whom Eric H. Smith, Harry M. Plotkin and Ronald A. Cass, Washington, D. C., were on the brief for intervenor Public Broadcasting Service.

Richard D. Marks, Washington, D. C., with whom Daniel W. Toohey, Washington, D. C., was on the brief for intervenor, The University of Maine, and others.

Vernon L. Wilkinson, Washington, D. C., entered an appearance for intervenor, Educational Broadcasting Corp.

Before BAZELON, Chief Judge, LEVENTHAL, Circuit Judge and WEIGEL,* United States District Judge for the Northern District of California.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

BAZELON, Chief Judge.

Accuracy in Media, Inc. (AIM) filed two complaints with the FCC against the Public Broadcasting Service (PBS) concerning two programs distributed by PBS to its member stations. AIM alleged that the programs, dealing with sex education and the American system of criminal justice, were not a balanced or objective presentation of each subject and requested the FCC to order PBS to rectify the situation. The legal basis for AIM's complaints was the Fairness Doctrine[1] and 47 U.S.C. § 396(g)(1)(A) (1970). On its initial hearing of the matter, the FCC concluded that the PBS had not violated the Fairness Doctrine and invited comments from interested parties on its authority to enforce whatever standard of program regulation was contained in § 396(g)(1)(A).[2] AIM does not seek review of the Commission's decision on the Fairness Doctrine issue.

Section 396(g)(1)(A) is part of the Public Broadcasting Act of 1967, an act which created the Corporation for Public Broadcasting (CPB) and authorized it to fund various programming activities of local, non-commercial broadcasting licensees.[3] Section 396(g)(1)(A) qualifies that authorization in the following language:

> In order to achieve the objectives and to carry out the purposes of this subpart, as set out in subsection (a) of this section, the Corporation is authorized to—

(A) facilitate the full development of educational broadcasting in which programs of high quality, obtained from diverse sources, will be made available to noncommercial educational television or radio broadcast stations, with strict adherence to objectivity and balance in all programs or series of programs of a controversial nature. . . .

AIM contends that since the above-mentioned PBS programs were funded by the CPB, pursuant to this authorization, the programs must contain "strict adherence to objectivity and balance", a requirement AIM contends is more stringent than the standard of balance and fairness in overall programming contained in the Fairness Doctrine.[4] AIM alleges that the two relevant programs did not meet this more stringent standard of objectivity and balance.

After consideration of the comments received on the matter, invited in its preliminary decision discussed above, the Commission concluded that it had no jurisdiction to enforce the mandate of § 396(g)(1)(A) against CPB.[5] Having reached this result, the Commission thought it inappropriate to comment on what standard of program regulation was established by § 396(g)(1)(A) and whether that standard was more stringent than the Fairness Doctrine. The Commission did not explicitly consider whether the standard of § 396(g)(1)(A), whatever that standard might be, could be enforced against individual noncommercial licensees under the traditional

1. *See* The Fairness Doctrine and the Public Interest Standards, 48 F.C.C.2d 1, *appeal docketed National Citizens Comm. for Broadcasting v. FCC*, No. 74–1700 (D.C.Cir. July 3, 1974); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598 (1964). *Cf.* 47 U.S.C. § 315(a) (1970).

2. Accuracy in Media, Inc., 39 F.C.C.2d 416, 420 & n.1 (1973).

3. *See* 172 U.S.App.D.C. at page ——, 521 F.2d at page 291 *infra*.

4. *See* Brief for Petitioner Accuracy in Media, Inc., at 38–42. Apparently, AIM contends that

§ 396(g)(1)(A) expands the Fairness Doctrine in two ways. First, under § 396(g)(1)(A) the licensee, AIM argues, must achieve a balanced presentation of issues in each program or series of programs and may not rely on balanced discussion in overall programming to satisfy the Section, as the licensee may to satisfy the Fairness Doctrine. *See* note 1 *supra*. Second, the use of the term "objective", somewhat foreign to Fairness Doctrine discussion, suggested to AIM that a more searching inquiry into alleged factual inaccuracies than contemplated by the Fairness Doctrine, *see* note 39 *infra*, is contemplated by § 396(g)(1)(A).

5. Accuracy in Media, Inc., 43 F.C.C.2d 851 (1973).

jurisdictional grants contained in the Federal Communications Act. AIM petitions for review of the Commission's decision arguing that the Commission wrongly concluded that it had no jurisdiction to enforce the mandate of § 396(g)(1)(A) against CPB. We affirm the Commission's decision and deny the petition for review. After describing in Part I the present system of public broadcasting, we conclude in Part II— for essentially the same reasons advanced by the Commission—that the Commission does not have jurisdiction to enforce the mandate of § 396(g)(1)(A) against the CPB.

## I. The Organization of Public Broadcasting in the United States

Resolution of the issues raised by AIM's petition requires an understanding of the operation of the public broadcasting system. There are three tiers to this operation, each reflecting a different scheme of governmental regulation. The basic level is comprised of the local, noncommercial broadcasting stations that are licensed by the FCC [6] and, with a few exceptions,[7] subject to the same regulations as commercial licenses.

Through the efforts of former Commissioner Frieda Hennock, the FCC has reserved exclusive space in its allocation of frequencies for such noncommercial broadcasters.[8] Other than this specific reservation, noncommercial licenses are still subject to the same renewal process and potential challenges as their commercial counterparts.

Such was the state of the public broadcasting system until the passage of the Educational Television Facilities Act in 1962.[9] The Act added the element of government funding to public broadcasting by establishing a capital grant program for noncommercial facilities. This second level of the system was reorganized and expanded by the Public Broadcasting Act of 1967 [10] which created the Corporation for Public Broadcasting (CPB). The Corporation, the product of a study made by the Carnegie Commission on Educational Television,[11] was established as a funding mechanism for virtually all activities of noncommercial broadcasting. In setting up this nonprofit, private corporation, the Act specifically prohibited CPB from engaging in any form of "communication by wire or radio." [12]

**6.** 47 U.S.C. § 307 (1970). *See also* 47 C.F.R. § 73.621 (1973).

**7.** *See, e. g.,* 47 C.F.R. § 73.621 (1973) (qualification standards for noncommercial broadcasters and regulations pertaining to advertising); 47 U.S.C. § 399 (1970) (educational broadcasting stations prohibited from editorializing and required to keep tapes of controversial programs).

**8.** *See* Sixth Report and Order on Television Allocation, 41 F.C.C. 148, 158–67, 227–563 *passim* (1952); *id.* at 588–605 (Hennock, Comm'r, concurring in part, dissenting in part). *See also Joint Council on Educ. Broadcasting v. FCC*, 113 U.S.App.D.C. 86, 305 F.2d 755 (1962); Comm. for Economic Development, Broadcast and Cable Television: Policies for Diversity and Change 47 (1975). For an early history of the reservation of broadcast frequencies, *see* J. Powell, Channels of Learning: The Story of Educational Television (1962).

**9.** Educational Television Facilities Act of May 1, 1962, Pub.L.No. 87–447, 76 Stat. 64.

**10.** Public Broadcasting Act of Nov. 7, 1967, Pub.L.No. 90–129, 81 Stat. 365.

**11.** *See* Burke, *The Public Broadcasting Act of 1967: Part I: Historical Origins and the Carnegie Commission,* 6 *Educ. Broadcasting Rev.* 105–119 (1972); *Part II: The Carnegie Commission Report, Development of Legislation, and the Second National Conference on Long-Range Financing,* 6 *Educ. Broadcasting Rev.* 178–192 (1972); Broadcast and Cable Television, *supra* note 8, at 47–48.

**12.** The words "communication by wire or radio" are in the general jurisdictional grant of the FCC in 47 U.S.C. §§ 151, 152. The 1967 Act categorically lists the facilities that the Corporation may not own or operate, 47 U.S.C. § 396(g)(3). All of these facilities come within the statutory definition of communication by wire or radio as set forth in 47 U.S.C. § 153(a) and (b). We discuss in Part II the relevance of this prohibition to the denial of jurisdiction by the FCC.

The third level of the public broadcasting system was added in 1970 when CPB and a group of noncommercial licensees formed the Public Broadcasting Service (PBS) and National Public Radio.[13] The Public Broadcasting Service operates as the distributive arm of the public television system. As a nonprofit membership corporation, it distributes national programming to approximately 150 educational licensees via common carrier facilities. This interconnection service is funded by the Corporation (CPB) under a contract with PBS; in addition, much of the programming carried by PBS is either wholly or partially funded by CPB. National Public Radio provides similar services for noncommercial radio. In 1974, CPB and the member licensees of PBS agreed upon a station program cooperative plan[14] to insure local control and origination of noncommercial programming funded by CPB. Though PBS is the national coordinator under this scheme, it is not a "network" in the commercial broadcasting sense, and does not engage in "communication by wire or radio," except to the extent that it contracts for interconnection services.

## II. FCC Jurisdiction Over the Corporation for Public Broadcasting

■ With the structure of the public broadcasting system in view, we turn to AIM's contention that the FCC should enforce the mandate of § 396(g)(1)(A) against the CPB. Since the Section is clearly directed to the Corporation and its programming activities, we have no doubt that the Corporation must respect the mandate of the Section. However, we conclude that nothing in the language and legislative history of the Federal Communications Act or the Public Broadcasting Act of 1967 authorizes the FCC to enforce that mandate against the CPB.

■ Section 398 of the Communications Act expresses the clear intent of Congress that there shall be no direct jurisdiction of the FCC over the Corporation. That section states that nothing in the 1962 or 1967 Acts "shall be deemed (1) to amend any other provision of, or requirement under this Act; or (2) to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision or control over educational television or radio broadcasting, or over the Corporation or any of its grantees or contractors . . . ." Since the FCC is obviously an "agency . . . of the United States" and since any enforcement of § 396(g)(1)(A) would necessarily entail "supervision" of the Corporation, the plain words of subsection (2) preclude FCC jurisdiction. We decline to rely entirely on the literal meaning of § 398, however. Section 399 of the 1967 Act, as amended in 1973,[15] is contrary to the § 398 prohibition in that it mandates "supervision" of noncommercial licenses and contemplates FCC enforcement.[16] The conflict between § 398 and § 399 creates at least an ambiguity which casts a cloud on the literal meaning of § 398. To resolve any doubts created thereby,

---

**13.** See Broadcast and Cable Television, *supra* note 8, at 47.

**14.** The Station Program Cooperative (SPC) is a unique concept in program selection and financing for public television stations. Though the idea of public television as a "fourth network" had been proposed at various times, the 1974 plan reversed this trend toward centralization. Under the SPC, certain programming will be produced only if the individual local stations decide together to fund the production. The local licensees will be financed through the CPB and other sources; the funding of specific programs will be by a 4 to 5 ratio (station funds to national cooperative funds). The aim of this cooperative is to rein-

force the existing licensee responsibility for programming discretion. Through this plan the local stations will eventually assume the responsibility for support of the cooperative and the Corporation will concentrate on new programming development. *See* N. Katzman, Public Television's Station Program Cooperative (mimeo, 1974).

**15.** 47 U.S.C. § 399 (Supp. III 1973).

**16.** Section 399 prohibits noncommercial licensees from political editorializing and requires them to keep tapes of controversial programming. This requirement implies a supervisory role for the FCC over the record-keeping.

we look to the legislative history of the 1967 Act for extrinsic evidence of its meaning.[17]

Congress desired to establish a program funding agency which would be free from governmental influence or control in its operations. Yet, the lawmakers feared that such complete autonomy might lead to biases and abuses of its own. The unique position of the Corporation is the synthesis of these competing influences. Reference to the legislative history of the 1967 Act shows a deep concern that governmental regulation or control over the Corporation might turn the CPB into a Government spokesman. Congress thus sought to insulate CPB by removing its "programming activity from governmental supervision." [18] Representative of this intent is the following statement from the Report of the House Committee on Interstate and Foreign Commerce: [19]

How can the Federal Government provide a source of funds to pay part of the cost of educational broadcasting and not control the final product? That question is answered in the bill by the creation of a nonprofit educational broadcasting corporation.

Every witness who discussed the operation of the Corporation agreed that funds for programs should not be provided directly by the Federal Government. It was generally agreed that a nonprofit Corporation, directed by a Board of Directors, none of whom will be Government employees, will provide the most effective insulation from Government control or influence over the expenditure of funds.

■ In addition to this legislative history and the aforementioned prohibition contained in § 398, we note that any FCC jurisdiction over the CPB would constitute a radical extension of the FCC's basic jurisdictional grant. The jurisdictional provisions of the Communications Act limit FCC regulation to "interstate and foreign communication by wire or radio." The Corporation for Public Broadcasting is expressly forbidden to engage in such activities.[20] While the Supreme Court has described the jurisdictional powers of the FCC as "not niggardly, but expansive," [21] there are limits to those powers. No case has ever permitted, and the Commission has never, to our knowledge, asserted jurisdiction over an entity not engaged in "communication by wire or radio."

Petitioner's reliance upon FCC jurisdiction over cable television franchises to support its jurisdictional claim is mis-

17. Section 398, formerly § 397, was amended by the 1967 Act to include the Corporation and its activities. The original section was enacted as a provision of the Educational Television Facilities Act of 1962. The prohibition on federal interference was included then as part of an understanding that "the FCC is not to exercise any control of funds under this program". S.Rep.No.67, 87th Cong., 2d Sess., at 9 (1962), U.S.Code Cong. & Admin.News 1962, pp. 1614, 1620. The expansion of the prohibition to apply to the Corporation and its activities is in keeping with the original fear that financial support by the Government could lead to control over speech.

18. H.R.Rep.No.572, 90th Cong., 1st Sess., at 19 (1967), U.S.Cong. & Admin.News 1967, pp. 1772, 1810.

19. Id., at 15, U.S.Code Cong. & Admin.News 1967, p. 1805. Senator Pastore, in his opening statement to the subcommittee hearings on the 1967 Act, emphasized his concern:

I intend to see that a full record is developed on this point and every possible safeguard written into the legislation necessary to assure complete freedom from any Federal Government interference over programming.

Hearings on S. 1160 Before the Subcomm. on Communications of the Senate Comm. on Commerce, 90th Cong., 1st Sess., 9 (1967) (Senate Hearings). See Senate Hearings, 250 (Remarks of Newton Minow); Hearings on H.R. 6736 and S. 1160 Before the House Comm. on Interstate and Foreign Commerce (House Hearings), 90th Cong., 1st Sess., 493 (1967) (Statement of E. William Henry); 113 Cong.Rec. 26384 (1967) (Remarks of Rep. Staggers).

20. See note 12, supra. See also 47 U.S.C. §§ 301, 303 (1970).

21. National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

placed. Jurisdiction over CATV was expressly predicated upon a finding that the transmission of video and aural signals via the cable was "interstate . . . communication by wire or radio." [22] Further, assertions of "jurisdiction" over networks [23] are really no more than claims of expansive authority over the owned or affiliated individual licensees. In no case has the FCC taken direct jurisdiction over a network; in any event, CPB cannot be considered a network. In view of these prevailing limits, we will not presume that Congress meant by § 396(g)(1)(A) to radically alter the jurisdictional base of the FCC absent a clear statement to that effect.[24]

AIM maintains that this view of FCC jurisdiction to enforce § 396 (g)(1)(A) renders the Section nugatory and hence ignores the Congressional sentiment that biases and abuses within the public broadcasting system should be controlled.[25] We do not view our holding on the FCC's jurisdiction as having that effect. Rather, we take notice of the carefully balanced framework designed by Congress for the control of CPB activities.

The Corporation was established as nonprofit and non-political in nature [26] and is prohibited from owning or operating "any television or radio broadcast station, system or network, community antenna system, or interconnection, or production facility." [27] Numerous statutory safeguards were created to insure against partisan abuses.[28] Ultimately, Congress may show its disapproval of any activity of the Corporation through the appropriation process.[29] This supervision of CPB through its funding is buttressed by an annual reporting requirement.[30] Through these statutory requirements and control over the "purse-strings," Congress reserved for itself the oversight responsibility for the Corporation.[31]

---

22. *United States v. Southwestern Cable Co.*, 392 U.S. 157, 168, 88 S.Ct. 1994, 2000, 20 L.Ed.2d 1001 (1968). In *Southwestern*, the Court recognized the extension of FCC jurisdiction to CATV as part of "the rapidly fluctuating factors characteristic of the evolution of broadcasting and of the corresponding requirement that the administrative process possess sufficient flexibility to adjust itself to these factors." 392 U.S. at 172–73, 88 S.Ct. at 2003. Cable television was an unforeseen *technological* innovation at the time of the 1934 Communications Act; Congress intended to include forthcoming scientific improvements within the FCC's jurisdiction. The CPB, however, was not a technological innovation and was created by Congress itself. The intended limits to FCC regulation thus could have been changed and were not. The intent of the § 398 prohibition is thus manifest. *See also Illinois Citizens Comm. for Broadcasting v. FCC*, 467 F.2d 1397 (7th Cir. 1972).

23. *See National Broadcasting Co. v. United States*, 319 U.S. 190 (1943); *Iacopi v. FCC*, 451 F.2d 1142 (9th Cir. 1971); *Mount Mansfield Television, Inc. v. FCC*, 442 F.2d 470 (2d Cir. 1971); *see also* Appalachian Research & Defense Fund, 39 F.C.C.2d 708, 710–12 (1973); Phillip H. Schott, 29 F.C.C.2d 35, 36 (1971) (in which the Commission expressly refused to assert jurisdiction over networks).

24. *See United States v. American Trucking Ass'n*, 310 U.S. 534, 546–47, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); cases cited note 22 *supra*; *cf. Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

25. Brief for Petitioner at 43.

26. 47 U.S.C. § 396(f) (1970).

27. 47 U.S.C. § 396(g)(3) (1970).

28. Other statutory checks on the Corporation include: restricting the Board membership to no more than eight out of fifteen members from the same political party, § 396(c)(1). The composition of the Board was an important issue during debate and the decision to make the Board bi-partisan was a significant addition to the original Carnegie Commission proposal. The Act also requires that the CPB's accounts be audited annually by an independent accountant, § 396(*l*)(1)(A), and *may* be audited by the General Accounting Office, § 396(*l*)(2)(A).

29. Section 396(k) assures that most of the CPB's operating budget be derived through the Congressional appropriation process.

30. 47 U.S.C. § 396(i) (1970).

31. Senator Cotton explained Congressional oversight:

> If this bill becomes law . . . and if, as time goes on, we have occasion to feel that there is slanting, a bias, or an injustice, we instantly and immediately can do something about it. First, we can make very un-

A further element of this carefully balanced framework of regulation is the accountability of the local noncommercial licensees under established FCC practice, including the Fairness Doctrine in particular. This existing system of accountability was clearly recognized in the 1967 legislative debates as a crucial check on the power of the CPB. Congressman Staggers, chairman of the House committee which considered the Public Broadcasting Act and floor manager of the Act, described the role of local responsibility:[32]

At all times the local stations have the right to accept or reject any pro-

gram. The Corporation cannot require that a station broadcast any program. As required under present law, and as will be required under the new law, the sole responsibility for what goes out over the air rests upon the individual station licensee. This bill, I repeat, *does not impair or affect the existing statutory duty and responsibility of the station licensee.*

■ We find nothing in § 398 which limits established FCC authority, including the Fairness Doctrine, over local noncommercial licensees.[33] The § 398

---

comfortable, and give a very unhappy experience to, the directors of the Corporation. Second, we can shut down some of their activities in the Appropriations Committee and in the appropriating process of Congress . . . . The Corporation is much more readily accessible . . . to the Congress, if it is desired to correct any injustice or bias which might appear.

113 Cong.Rec. 13003 (1967). Senator Pastore rebutted any inference of Corporation lack of accountability:

The whole responsibility here under this law is to the Congress of the United States . . . . [W]e don't have to repeat the appropriation if we feel this is a failure. This is all subject to the scrutiny of the Congress of the United States, and that is the point I want to leave here.

*Senate Hearings, supra* note 19 at 123.

**32.** 113 Cong.Rec. 26384 (1967) (emphasis added). *See also Hearings on H.R. 6736 & S. 1160 Before the House Comm. on Interstate and Foreign Commerce,* 90th Cong., 1st Sess. 188, 221 (1967):

Mr. HYDE. We would license all the individual stations in the educational network or those not operating in the network. Their operation would be subject to our licensing authority.

In that connection, we would be interested in the programming that they present. They would be getting these programs through the assistance of public corporation and that is where our relationship would lie.

\* \* \* \* \* \*

Mr. HYDE. The station operator must be the judge, the licensee.

Mr. KUYKENDALL. Who holds them responsible?

Mr. HYDE. The FCC.

Mr. KUYKENDALL. So you are the boss of this?

Mr. HYDE. We are the boss in the sense that we hold a licensee responsible for everything it broadcasts. There are certain rules and regulations, certain policies, which are applicable, but the judgment as to whether a program is received or not re-. ceived, or the conditions, is up to the licensee of the individual station.

Reliance on the Fairness Doctrine as one element of the CPB regulatory scheme is evident in the following exchange between Senator Thurmond and Senator Pastore:

Mr. THURMOND. . . . [W]ould the fairness doctrine promulgated by the Federal Communications Commission provide for the airing of philosophies or ideas contrary to those which may be expressed in programs prepared by the Corporation?

Mr. PASTORE. Well, the licensee who accepts the program is subject to the Communications Act, and the fairness doctrine thus applies . . . . .

Mr. THURMOND. Would the time be offered free of charge, as is now required under the fairness doctrine to give the opposing view?

\* \* \* \* \* \*

Mr. PASTORE. Absolutely. If anyone feels he is offended under the fairness doctrine, he can appeal to the FCC and he will receive the same privileges and the same courtesies which he receives under commercial television.

113 Cong.Rec. 13002 (1967). *See also House Hearings* at 250, 364, 517.

**33.** While § 398 prohibits FCC jurisdiction over CPB and its program-related activities, i. e., production, funding or distribution, the Commission retains its authority concerning the *broadcasting* of programs, whether funded by CPB or not. In fact, as discussed in Part III, FCC regulation of the educational licensees was seen as the ultimate check on the pub-

prohibition against governmental interference is expressly limited to authorizations "contained in [this part]" of the Communications Act. The Fairness Doctrine and other public interest responsibilities are contained in provisions outside of the Public Broadcasting Act (§§ 390–99).[34] Additionally, subsection (1) of § 398 clearly stated that nothing in these sections of the 1967 Act shall be deemed to amend "any other provision . . . or requirement under this chapter." We thus conclude that the Commission correctly held that it may enforce the Fairness Doctrine against noncommercial licensees.

■ The framework of regulation of the Corporation for Public Broadcasting we have described—maximum freedom from interference with programming[35] coupled with existing public accountability requirements—is sensitive to the delicate constitutional balance between the First Amendment rights of the broadcast journalist and the concerns of the viewing public struck in *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). There the Supreme Court warned that "only when the interests of the public are found to outweigh the private journalistic interests of the broadcasters"[36] will governmental interference with broadcast journalism be allowed. The Court on the basis of this rule rejected a right of access to broadcast air time greater than that mandated by the Fairness Doctrine as constituting too great a "risk of an enlargement of Government control over the content of broadcast discussion of public issues."[37]

It is certainly arguable that FCC application of the standard—whatever that standard may be—of § 396(g)(1)(A) could "risk [an] enlargement of Government control over the content of broadcast discussion of public issues" in the following two ways:[38] whereas the existing Fairness Doctrine requires only that the presentation of a controversial issue of public importance be balanced in *overall* programming, § 396(g)(1)(A) might be argued to require balance of controversial issues within each individual program. Administration of such a standard would certainly require a more active role by the FCC in oversight of programming. Furthermore, whereas the FCC has at present carefully avoided anything but the most limited inquiry into the factual accuracy of programming,[39] § 396(g)(1)(A) by use of the term "objective" could be read to expand that inquiry and thereby expand FCC oversight of programming. Both of these potential enlargements of government control of programming, whether directed against the CPB, PBS or individual noncommercial licensees,[40] threaten to upset

lic broadcasting system. In this light § 396(g)(1)(A) is in part a reminder to CPB that the programs it finances will be subject to the same fairness requirements as all other programming.

**34.** The Fairness Doctrine finds its source of authority in the language of 47 U.S.C. § 315(a) specifically, and in the "public convenience, interest and necessity" provision of 47 U.S.C. § 303 (1970) generally. *See* note 1, *supra.*

**35.** *See* 47 U.S.C. § 396(a)(6), (g)(1)(D) (1970); *Senate Hearings* at 212 (remarks of E. William Henry).

**36.** 412 U.S. at 110, 93 S.Ct. at 2090.

**37.** *Id.* at 126, 93 S.Ct. at 2098.

**38.** *See* note 4 *supra.*

**39.** *See, e. g., Neckritz v. FCC*, 163 U.S.App. D.C. 409, 502 F.2d 411 (1974), *aff'g* Alan F.

Neckritz, 37 F.C.C.2d 528 (1973); Hunger in America, 20 F.C.C.2d 143 (1969); The Selling of the Pentagon, 30 F.C.C.2d 150 (1971).

**40.** Although § 396(g)(1)(A) by its terms is directed only to the Corporation, the question has arisen whether it may be applied against individual noncommercial licensees, given existing FCC jurisdiction over them, the fact the 1967 Act as amended imposes burdens on them not applicable to their commercial counterparts, *see* note 16 *supra*; 113 Cong.Rec. 7020 (1967) (remarks of Sen. Thurmond), and the Commission's power under the "public interest" standard to enforce provisions of the Communications Act and general law against licensees. *See* 47 U.S.C. § 151 (1970); Star Stations of Indiana, Inc., 51 F.C.C.2d 95, 100–07 (1975); Alabama Educ. Television Assn., 50 F.C.C.2d 461 (1975); Uniform Policy as to Violations by Applicants of Laws of United States, 1 P & F Radio Reg. 91:495 (pt. 3) (1951).

the constitutional balance struck in *CBS.* We will not presume that Congress meant to thrust upon us the substantial constitutional questions such a result would raise.[41] We thus construe § 396(g)(1)(A) and the scheme of regulation for public broadcasting as a whole to avoid such questions.

■ Our view of § 396(g)(1)(A), as colored by the constitutional misgivings just expressed, does not presume the Section to be superfluous. Rather we view the provision as a guide to Congressional oversight policy and as a set of goals to which the Directors of CPB should aspire.[42] The provision is not a substantive standard, legally enforceable by agency or courts. The language of the Section comports with this view:

> the Corporation *is authorized* to—(A) *facilitate* the full development of educational broadcasting in which programs of *high quality*, obtained from

diverse sources, *will be made available . . .* with strict adherence to objectivity and balance . . . (emphasis added).

The Corporation is not required to provide programs with "strict adherence to objectivity and balance" but rather to "facilitate the full development of educational broadcasting in which programs . . . will be made available . . . ." We leave the interpretation of this hortatory language to the Directors of the Corporation and to Congress in its supervisory capacity. We hold today only that the FCC has no function in this scheme of accountability established by § 396(g)(1)(A) and the 1967 Act in general other than that assigned to it by the Fairness Doctrine. Therefore, we deny the petition for review and affirm the Commission's decision rejecting jurisdiction over the Corporation for Public Broadcasting.

*So Ordered.*

---

Since AIM's original complaint was filed against the local licensees and PBS, the contention § 396(g)(1)(A) applied to those entities was before the Commission and this court may review the Commission's implicit ruling that no such authority exists. *See Office of Communication of Christ Church v. FCC,* 150 U.S.App.D.C. 339, 465 F.2d 519, 523–24 & n. 17 (1972); *cf.* 47 U.S.C. § 405 (1970); *Joseph v. FCC,* 131 U.S.App.D.C. 207, 404 F.2d 207, 210 (1968).

**41.** It is an often stated rule that "a statute should be interpreted, if fairly possible, in such a way as to free it from not insubstantial constitutional doubts." *Lynch v. Overholser,* 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962). *See Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). *See also Tarlton v. Saxbe,* 165 U.S. App.D.C. 293, 507 F.2d 1116 (1974).

Further constitutional doubts concerning an "objectivity and balance" standard may be raised on vagueness grounds. Such words may require "all persons to guess just what the law really means to cover, and fear of a wrong guess inevitably leads people to forego" their First Amendment rights. *Barenblatt v. United States,* 360 U.S. 109, 137, 79 S.Ct. 1081, 1099, 3 L.Ed.2d 1115 (1959) (Black, J., dissenting); *see Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Interstate Circuit*

*v. City of Dallas,* 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 415 (1968); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

The constitutional doubts discussed in the text are raised by a regulatory scheme in which an administrative agency has review powers over the speech of a publicly-funded entity. The constitutional issues raised by public funding decisions which discriminate on the basis of the contents of the messages to be funded would be substantially different. We may, as did the Supreme Court in *Columbia Broadcasting System, Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 119–21, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), assume the constitutional balance discussed in the text applies whether or not the actions of the licensees are considered "state" or "governmental" action, so long as the issue is the scope of FCC enforcement powers and not the permissibility of public-funding decisions. *See also Cousins v. Wigoda,* 419 U.S. 477, 483–4 n. 4, 95 S.Ct. 541, 42 L.Ed.2d 595.

**42.** This sort of statutory authorization is not unknown in the U.S.Code. *See, e. g.,* National Environmental Policy Act of 1969, 42 U.S.C. § 4331 (1970); Employment Act of 1946, 15 U.S.C. § 1021 (1970); Atomic Energy Act of 1954, 42 U.S.C. §§ 2011, 2013 (1970); National Labor Relations Act, 29 U.S.C. § 151 (1970).