Gertrude **BARNSTONE**, and Harvey Malyn, Plaintiffs,

v.

The **UNIVERSITY OF HOUSTON, KUHT–TV, and Patrick J. Nicholson**, in his individual and representative capacity as University of Houston Systems Vice President, Defendants.

Civ. A. No. H–80–1048.

United States District Court,
S. D. Texas,
Houston Division.

Dec. 18, 1980.

See also, 487 F.Supp. 1347.

David H. Berg, David H. Berg & Associates, Houston, Tex., for plaintiffs.

L. Gregory Wilson, Austin, Tex., Pat Bailey, University of Houston, Houston, Tex., for defendants.

Raymond L. Kalmans, Neel, Hopper & Kalmans, Houston, Tex., for Public Broadcasting amicus curiae.

## MEMORANDUM AND ORDER

McDONALD, District Judge.

### INTRODUCTION

This action challenges the decision of the University of Houston not to air the controversial program, "Death of a Princess," as previously scheduled on its public television station, KUHT–TV. The plaintiffs contend that the decision by Dr. Patrick J. Nicholson, Vice President for Public Information and University Relations of the University of Houston, not to telecast "Death of a Princess" on KUHT–TV, the public television station owned and operated by the University, on Monday, May 12, 1980, at 8:00 p. m., deprived them of their constitutional rights under the First and Fourteenth Amendments. The defendants, Dr. Nicholson, the University of Houston, and KUHT–TV, deny that the plaintiffs' constitutional rights were violated and raise several procedural objections.

The present case was originally filed by plaintiff Gertrude Barnstone on Thursday, May 8, 1980. The following day, May 9, 1980, after a full hearing in which all the parties were ably represented, the Court granted the plaintiff's request for a temporary restraining order. A written order was entered, supplemented the morning of May 12, 1980, compelling the defendants to telecast "Death of a Princess" at its originally scheduled time and date. On the afternoon of May 12, 1980, the date that "Death of a Princess" was originally scheduled and subsequently ordered to be shown by this Court, the United States Court of Appeals for the Fifth Circuit, on the "condition that the Defendants . . . tape and pre-

serve the program in issue herein," vacated the temporary restraining order entered by this Court. *The University of Houston v. Barnstone*, No. 80–1527 (5th Cir. May 12, 1980). That evening, prior to 8:00 p. m., United States Supreme Court Justice Powell, Circuit Justice for the Fifth Circuit, denied the plaintiff's motion to stay the order entered by the Fifth Circuit. *Barnstone v. University of Houston*, 446 U.S. 1318, 100 S.Ct. 2144, 64 L.Ed.2d 488 (1980). Thus, in accordance with Dr. Nicholson's earlier decision, "Death of a Princess" was not shown on KUHT–TV, although it was taped and preserved as directed by the Fifth Circuit.

Both the plaintiff and the defendants subsequently moved for summary judgment. The voluminous memoranda filed by the parties were supplemented by an equally extensive brief filed by the Public Broadcasting Service, which was granted leave by this Court to participate as *amicus curiae*. The Public Broadcasting Service (PBS), of which KUHT–TV is a member, distributed "Death of a Princess." Because significant material facts were still in dispute, *see* Fed. R.Civ.P. 56(c), and because the Fifth Circuit's action of May 12, 1980, was viewed by the Court as conveying the desirability of the development of a full factual record, the motions for summary judgment were denied. Harvey A. Malyn was granted leave to join this action as a party-plaintiff and trial was set for August 19, 1980.

The trial and oral arguments took the better part of three full days, concluding late in the afternoon on August 21, 1980. Since that time, supplemental memoranda have been filed by both sides. The Court has now had an opportunity to fully review the facts, the law, and the arguments of the parties. In accordance with that review, it finds that the decision not to show "Death of a Princess" on KUHT–TV at 8:00 p. m. on May 12, 1980, deprived plaintiffs Barnstone and Malyn of the rights guaranteed to them by the First and Fourteenth Amendments to the Constitution of the United States.

## THE FACTUAL SETTING

The University of Houston is a co-educational institution of higher learning operating under the authority of Texas law. *See* Tex.Educ.Code Ann. §§ 111.01 *et seq.* (Vernon). The control of the University is vested in a Board of Regents, *id.* at § 111.11, whose members are appointed by the Governor with the advice and consent of the Senate. *Id.* at § 111.12. Approximately 50 percent of the University's operating budget comes directly from the State of Texas' general revenue funds.

One of the activities conducted by the University of Houston is the operation of KUHT–TV, a noncommercial educational television station licensed to it by the Federal Communications Commission under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*, as amended. KUHT–TV obtains its power from the University of Houston and is housed in a building maintained by the University and located on the campus. Approximately 60 percent of KUHT–TV's annual budget of $2.7 million dollars in the coming year consists of public funds from the Association for Community Television (ACT). About 12 percent of its budget is derived from state funds obtained from the Gulf Regional Educational Television Affiliate (GRETA) for the broadcasting services provided to local school districts during the school year. The remainder of its funds come from federal community service grants. The parties have stipulated that both the University of Houston and KUHT–TV constitute "governmental entities" for the purpose of First Amendment analysis. *See Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (hereinafter referred to as *CBS v. DNC*).

As a member of PBS, KUHT–TV participates in the Station Program Cooperative (SPC). This program, described as a "unique concept in program selection and financing for public television stations," *Accuracy in Media, Inc. v. Federal Communications Commission*, 521 F.2d 288, 292 n.14 (D.C.Cir.1975), was introduced to give local public television stations more control over

the content of the programs shown in the national public television broadcasting system. Blakely, *To Serve the Public Interest* 206 (1979). The SPC works in the following manner. Producers or production companies that have a program or series they want to offer to a public television station contact PBS. They advise PBS what the program or series is about and the price the station must pay to obtain the rights to broadcast it. PBS then makes a catalogue, summarizing this information, which it distributes to its member stations. By negative or affirmative vote, each station indicates whether it is willing to pay its portion of the cost of purchasing the rights to broadcast the program or series. If enough stations vote to share the costs, PBS purchases the rights to broadcast the program or series, schedules it, publicizes it, and distributes it to its member stations for broadcasting. The stations that refuse to contribute to the costs of purchasing the rights to the program or series are prohibited from televising it. The stations that agree to share the costs of obtaining the rights to the program or series are free to broadcast or not broadcast the project as they wish. *See, Memorandum of Amicus Public Broadcasting Service in Support of Defendants*, at 3 (hereinafter referred to as *Brief of PBS*); *The Broadcast Industry* 203 (R. Stanley, ed. 1975); *Accuracy in Media, supra*.

This latter provision, e. g., that stations which voted and paid to obtain the show are still free to refuse to show it, stems not only from PBS's "Station User's Agreement," *Brief of PBS*, at 4, but from the regulatory structure established by Congress in the Communications Act of 1934 and the Public Broadcasting Act of 1967, 47 U.S.C. §§ 390–399, since amended. *See CBS v. DNC, supra*, 412 U.S. at 116, 93 S.Ct. at 2093; *Federal Communications Commission v. Midwest Video Corporation*, 440 U.S. 689, 704–705, 99 S.Ct. 1435, 1443–1444, 59 L.Ed.2d 692 (1979); S.Rep.No.222, 90th Cong., 1st Sess. 14–14, *reprinted in* [1967] U.S.Code

Cong. & Ad.News 1772, 1794. *See also* 47 C.F.R. § 73.658(e).

Sometime prior to May, 1980, PBS sent an SPC catalogue to KUHT–TV. After reviewing the catalogue, KUHT–TV, by affirmative vote, like 144 other public television licensees, agreed to share in the costs of obtaining the rights to televise a thirteen-program series entitled "World." *Brief of PBS*, at 3. The series was obtained and distributed by PBS and aired regularly by KUHT–TV. One of the programs in the series, produced jointly by WGBH Educational Foundation, licensee of noncommercial educational television station WGBH–TV in Boston, Massachusetts, and ATV Network of London, England, was entitled "Death of a Princess." *Id.* at 2. A documentary re-creation of the events surrounding the execution of a Saudi Arabian princess and her lover by the Saudi Arabian government, "Death of a Princess" was scheduled for distribution by PBS on Monday, May 12, 1980, at 8:00 p. m. KUHT–TV announced in its monthly program schedule, "The Public Times," (Plaintiffs' Exhibit 4) that it would televise the program at that time. During the second week in April, 1980, however, PBS alerted KUHT–TV and its other member stations, pursuant to its previously established policy, to the fact that "Death of a Princess" contained what it referred to as "controversial material."

The President of the University of Houston, Dr. Charles E. Bishop, and the Board of Regents of the University had delegated full responsibility for the operation of KUHT–TV, as well as KUHT radio, to Dr. Patrick J. Nicholson, the Vice President for Public Information and University Relations and a defendant in this case.[1] Dr. Nicholson, in turn, had delegated full responsibility for programming at KUHT–TV to Mr. James Bauer, KUHT–TV's General Manager, and Ms. Virginia Mampre, KUHT–TV's Director of Programming. *See* Plaintiffs' Exhibits 8, 9.

---

1. Since the initiation of this suit, Dr. Nicholson has decided to resign from his position as vice president after Feb. 1, 1981. He testified that

his decision was not prompted by this case or the events which precipitated its filing.

In his seventeen (17) years of supervising the operation of KUHT–TV, Dr. Nicholson had never, he testified, decided what was or was not to be shown by the station. Notwithstanding that fact, when KUHT–TV was notified by PBS that "Death of a Princess" contained "controversial material," Dr. Nicholson stepped in. He reviewed the program, at Mr. Bauer's suggestion, twice before May 1, 1980, and briefly discussed the show with both Mr. Bauer and Ms. Mampre. On May 1, 1980, Dr. Nicholson—acting on his own authority and notifying neither Mr. Bauer nor Ms. Mampre of his decision—issued a press release stating that KUHT–TV would not carry "Death of a Princess." The press release, in its entirety, read as follows:

FOR IMMEDIATE RELEASE, NOON, CDST, May 1, 1980

KUHT, the nation's pioneer public television station licensed to the University of Houston, will not carry "Death of a Princess," it was announced today. The Public Broadcasting Service (PBS) documentary recreation, scheduled for broadcast May 12, has become the center of a rising storm of controversy since it was shown in England as a joint production of ATF, England and WGBH, Boston. Saudi Arabia ordered the British ambassador to return to London after the telecast.

Patrick J. Nicholson, University of Houston System vice president who has administered KUHT since 1965, issued a prepared statement regarding cancellation of the program. The statement emphasized that the decision not to broadcast it was one of the extremely rare instances in which KUHT, first of the now 287 public television stations to go on the air, had cancelled PBS programming, but an action clearly indicated on balance.

Dr. Nicholson cited as a central issue "strong and understandable objections by the government of Saudi Arabia at a time when the mounting crisis in the Middle East, our long friendship with the Saudi government and U. S. national interests all point to the need to avoid exacerbating the situation."

He said that in KUHT's view, "The Death of A Princess" specifically charges widespread moral laxity at high levels of Saudi Arabian society, and questions the organization and policies of the Saudi government, through recreated interviews and narrative. These allegations are not balanced in a responsible manner, Dr. Nicholson added.

Neither Ms. Mampre nor Mr. Bauer agreed with Dr. Nicholson's decision to cancel the program. Ms. Mampre, informed of Dr. Nicholson's decision after his statement had been released, told both Dr. Nicholson and Mr. Bauer that she disagreed with the decision. In a memorandum to Mr. Bauer, dated May 5, 1980 (Plaintiffs' Exhibit 6), Ms. Mampre wrote that she had scheduled the two hour special to air since the program was an example of the type of informational and public affairs programming called for by KUHT's charter. She noted that based on information received from PBS and WGBH all of the events portrayed in the film had at least two sources. Dr. Nicholson's decision not to air was made too early, Ms. Mampre concluded, in light of the fact that there were still two weeks left to analyze the international scene before making a final decision.

Mr. Bauer originally shared Dr. Nicholson's concerns that "Death of a Princess" lacked balance and perspective. His view of matters altered, however, when he learned that the program would be "balanced" by the broadcast of a follow-up show featuring a panel discussion of "Death of a Princess" which included participation by local viewers. By May 12, 1980, Mr. Bauer testified, he was convinced that "Death of a Princess" should be shown. Neither Ms. Mampre nor Mr. Bauer, however, had the authority to overrule Dr. Nicholson.

In response to an inquiry by Dr. Bishop at the meeting of the Broadcasting, Development & Public Affairs Committee of the Board of Regents on May 5, 1980, Dr. Nicholson explained the decision to cancel "Death of a Princess." *See* Plaintiffs' Exhibits 2, 5. Dr. Nicholson implied to the

Committee that both Ms. Mampre and Mr. Bauer shared his view of the program. *See* Plaintiffs' Exhibit 5. In addition, in a conversation with Dr. J. Dans Armistead, Chairman of the Committee and a member of the Board of Regents, Dr. Nicholson emphasized that the final decision fell on him rather than the Board. In this respect, said Dr. Nicholson, he was acting as a "heat shield" for the President and the Board. *Id.*

Dr. Bishop, President of the University, testified that he felt that it would have been improper to overrule Dr. Nicholson's decision. Dr. Nicholson, Dr. Bishop noted, had been delegated the responsibility to run KUHT–TV. He was not aware that Dr. Nicholson had delegated the responsibility for programming decisions to Ms. Mampre and Mr. Bauer. *See* Plaintiffs' Exhibits 8, 9. Nor was he aware that Dr. Nicholson had never before made a programming decision at KUHT–TV.

In addition to the reasons cited in his May 1, 1980 press release, the Court, upon consideration of Dr. Nicholson's testimony, finds that there are four other reasons why he may have decided to cancel the program. First, Dr. Nicholson said that he considered the program to be "in bad taste." The scenes in which the royal princesses arranged "assignations" with attractive young men were, Dr. Nicholson felt, particularly offensive. Second, Dr. Nicholson explained that he was concerned that some members of the public might believe that this "docu-drama" was a true documentary. Third, Dr. Nicholson testified that the University of Houston had previously entered into a lucrative contract with the Saudi Arabian royal family to instruct a particular princess as part of its "Open University" program. Under that contract, the University of Houston had sent a professor to Saudi Arabia to serve as the princess' tutor and to hand-tailor a curriculum to suit her needs. Dr. Nicholson stated that he believed the princess educated pursuant to the contract and the princess whose death was the subject of "Death of a Princess" were "distant cousins."

Finally, Dr. Nicholson testified that he had been in charge of all fundraising activities for the University of Houston from 1957 through 1978. Although a 1978 re-organization removed Dr. Nicholson from involvement with day-to-day fundraising, he was still responsible for soliciting large individual donations. The University of Houston, he testified, receives a significant percentage of its contributions from individuals in oil-related companies. According to Dr. Nicholson, 15 to 20 percent of the University of Houston's private contributions come directly from major oil companies. That percentage, it should be noted, does not include contributions from individuals who own shares in, have contracts with, or are employed by companies doing business in oil.

Upon learning of Dr. Nicholson's decision, on May 8, 1980, plaintiff Barnstone initiated this suit to require KUHT–TV to air "Death of a Princess." Ms. Barnstone is a subscriber to and regular viewer of KUHT–TV. Although "Death of a Princess" has not been publicly broadcast in Houston, after this Court's order granting her motion for a temporary restraining order was vacated Ms. Barnstone did manage to attend two private screenings of the program. She has not seen, however, the follow-up program broadcast on the public television stations that carried the program. She maintains quite insistently, furthermore, that she still wishes to see "Death of a Princess," along with the follow-up program, broadcast on KUHT–TV. Plaintiff Harvey Malyn is also a viewer of KUHT–TV who desires to see "Death of a Princess" aired on that station. Mr. Malyn, unlike Ms. Barnstone, has never seen "Death of a Princess," with or without its follow-up program. Both plaintiffs have asked this Court to issue a mandatory injunction requiring the showing of "Death of a Princess" on KUHT–TV.

### THE ARGUMENTS OF THE PARTIES SUMMARIZED

The plaintiffs fully recognize that the programming decisions of private commer-

cial television stations are not subject to constitutional attack. *See Kuczo v. Western Connecticut Broadcasting Company*, 566 F.2d 384 (2d Cir. 1977); *CBS v. DNC, supra.* They also acknowledge that the independent decision-making authority of privately owned and operated noncommercial television stations most likely immunizes their programming decisions from constitutional review. *See Community-Service Broadcasting of Mid-America, Inc. v. Federal Communications Commission*, 593 F.2d 1102, 1109 (D.C.Cir.1978). But KUHT–TV, the plaintiffs note, is both owned and operated by instrumentalities of the State of Texas. It is, as has been stipulated, a "governmental entity," *see CBS v. DNC, supra*, for the purposes of First Amendment analysis. It is therefore, the plaintiffs contend, a "public forum," *see CBS v. DNC, supra*, 412 U.S. at 140, 93 S.Ct. at 2105 (Stewart, J., concurring), which cannot refuse to broadcast a program "because of its message, its ideas, its subject matter, or its content," *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Thus, the plaintiffs view KUHT's decision not to show "Death of a Princess" as an unlawful "prior restraint" in violation of the Constitution of the United States. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1976).

The defendants and *amicus curiae* PBS deny that KUHT–TV is a public forum. They argue that television stations owned and operated by the government may make the same programming decisions as television stations owned and operated by private individuals. Both, they say, are acting as editors and editorial freedom, it is well-established, in both newspapers, *Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and television, *CBS v. DNC, supra*, 412 U.S. at 124–125, 93 S.Ct. at 2097–2098, is protected by the First Amendment. The defendants and *amicus curiae* also raise three procedural objections which, they say, prevent the Court from reaching the merits

of this controversy. They are (1) that the case is moot because plaintiff Barnstone has already seen "Death of a Princess," (2) that this Court lacks subject matter jurisdiction because primary jurisdiction over this action rests with the Federal Communications Commission, and (3) that the plaintiffs lack standing to sue. These procedural arguments will be addressed first.

## MOOTNESS

■ The defendants contend that this action is moot because plaintiff Gertrude Barnstone has viewed "Death of a Princess" on at least two prior occasions. In support of this contention, they have submitted the affidavits of two individuals who swear that they have knowledge that Ms. Barnstone has already seen the program which she seeks to force KUHT–TV to air. This is not denied by Ms. Barnstone. There are three reasons, however, why the defendants' mootness claim must fail. First, Ms. Barnstone testified that she has never seen "Death of a Princess" in its entirety—with the follow-up panel discussion—as it was telecast on public television stations. Second, it is not simply the inability to view "Death of a Princess" of which Ms. Barnstone complains; it is the act of the government in keeping it from her. As the plaintiffs state in their reply to the defendants' motion for summary judgment, at 2 (hereinafter *Plaintiffs' Reply Brief*):

If Lamont in *Lamont v. Postmaster General*, 381 U.S. 301 [85 S.Ct. 1493, 14 L.Ed.2d 398] (1965) had already read a copy of the Peking Review which he ordered through the mail or if Stanley in *Stanley v. Georgia*, 394 U.S. 557 [89 S.Ct. 1243, 22 L.Ed.2d 542] (1969) had already privately viewed his obscene film many times before, the results in those cases would be no different. The present right to receive information free from this governmental obstruction, regardless of the motive for desiring such receipt, cannot be unconstitutionally abridged. [It is] the abridgement [itself which] presents [an actual] case or controversy.[2]

2. *See also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425

U.S. 748, 757 n.15, 96 S.Ct. 1817, 1823 n.15, 48 L.Ed.2d 346 (1976), in which the majority of the

Third, even if plaintiff Barnstone's claim is in some manner moot, that would not deprive this Court of the power to hear this action. Plaintiff Malyn has never seen "Death of a Princess" in any form on any medium. He claims that he wishes to see it on KUHT–TV. No prior viewing by Ms. Barnstone, of course, can prevent Mr. Malyn from obtaining a hearing before this Court.

Thus, even accepting all of the defendants' arguments, the most that could be said is that plaintiff Barnstone has no standing to maintain this action. As indicated above, plaintiff Malyn suffers from none of those alleged standing infirmities.

## PRIMARY JURISDICTION

The defendants and *amicus curiae* next argue that primary jurisdiction in the present case lies not with this Court, but with the Federal Communications Commission (FCC). With the passage of the Communications Act of 1934, the defendants and *amicus curiae* say, it was the intention of Congress to occupy the television field in its entirety. *See Allen B. Dumont Laboratories, Inc. v. Carroll,* 184 F.2d 153, 155 (3rd Cir. 1950), *cert. denied,* 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951). Thus, the courts may not, they maintain, consider the kinds of questions within the ambit of the FCC's jurisdiction except on appeal of FCC decisions. *See Writers Guild of America, West, Inc. v. American Broadcasting Company,* 609 F.2d 355 (9th Cir. 1979). The defendants and *amicus curiae* further argue that this case directly affects the basic regulatory scheme of the Communications Act, for it involves the question of the authority of licensees to make certain types of programming decisions. This is a matter, they assert, which should be resolved in a consistent manner nationwide. It must therefore, they insist, be considered first by the FCC.

A proper understanding of primary jurisdiction clearly shows that the doctrine is not applicable to the present case. As the United States Supreme Court said in *Nader v. Allegheny Air Lines, Inc.,* 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976), citing *United States v. Western Pacific Railway Company,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), the doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." In *Western Pacific, supra,* at 63–64, 77 S.Ct., at 165, the court had said:

> "Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play when the enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

Such deference by the courts to the role of the administrative agency is particularly applicable, the Supreme Court noted, where the disputed issue "involves technical questions of fact uniquely within the expertise and experience of an agency." *Nader, supra,* 426 U.S., at 304, 96 S.Ct., at 1987.

In the instant case, as with the mootness claim, there are three reasons why the doctrine of primary jurisdiction is not applicable. First, the plaintiffs' claim in the present case raises no issue which is peculiarly within the special expertise of the FCC. This Court would, of course, be obligated to defer to the FCC if this case involved issues "not within the conventional experiences of judges" or requiring "the exercise of administrative discretion." *Far East Conference v. United States,* 342 U.S.

Supreme Court takes issue with the position of the dissent that the right to receive information should be limited to those situations in which the information sought to be received "would not be otherwise reasonably available." Such

a situation, concluded the majority, would simply make the plaintiff's "First Amendment claim a stronger rather than weaker one," but would have no effect on the validity of the claim itself.

570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). No such issues, however, are present here. The plaintiffs in this case, unlike the plaintiffs in *Writer's Guild, supra,* do not challenge the validity of a specific policy claimed to be adopted under the Communications Act by the FCC. Nor do they assert that the decision not to air "Death of a Princess" violated a particular provision of the Communications Act. Their claim is not based on the Communications Act; it is, rather, based squarely on the First and Fourteenth Amendments. It is the federal courts, not the FCC, which have particular expertise in the interpretation of the Constitution.

Second, although under other circumstances it may prove both advisable and useful for a Court to obtain the opinion of the FCC on the issues presented to it, this is not such a case. The issues presented in the instant case are issues of first impression to this Court, but they have already been raised twice before the FCC. *See City of New York Municipal Broadcasting System,* 56 F.C.C.2d 169 (1975); *Mississippi Authority for Educational Television,* 71 F.C.C.2d 1296 (1979). In *City of New York, supra,* the FCC specifically held that, since the Communications Act of 1934 made no distinction between government owned and operated stations and privately owned and operated stations, the former were under no greater programming limitations than the latter. "[T]he public forum doctrine," the FCC wrote, "is inapplicable to broadcast licensees." *Id.* at 170. When the issue was raised again in *Mississippi Authority, supra,* the FCC considered it sufficiently without support to be disposed of in a footnote. *Id.* at 1312 n.23. It would therefore serve no useful purpose to refer this case to the FCC. The agency's position on this issue has already been stated with sufficient clarity.

Third, there is an even more compelling reason in this particular case why this Court should not defer to the FCC. The remedy that the plaintiffs in the instant case seek—a mandatory injunction requiring the airing of "Death of a Princess"—is not the type of remedy which the FCC is able to provide. The FCC is empowered to review a licensee's programming to determine whether it continues to serve the public interest of the community in which it is located. Where a long-standing pattern of abuse has been shown, the FCC can and does deny the licensee's application for renewal of its license. *See Star Stations of Indiana, Inc.,* 551 F.C.C.2d 95 (1975); *Alabama Educational Television,* 50 F.C.C.2d 461 (1975). Except where a violation of the fairness doctrine is concerned, however, the FCC does not have the power, or, at least, has not chosen to exercise the power to order any particular licensee to broadcast any specific program. *See Red Lion Broadcasting Co., Inc. v. Federal Communications Commission,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). *Right to Life of Louisville, Inc. v. Station WAVE–TV,* 59 F.C.C.2d 1103 (1976); and *In re Mark Lane,* 37 F.C.C.2d 630 (1972). As the FCC is powerless to grant the only remedy which the plaintiffs correctly argue will provide effective relief, a deferral of jurisdiction would be pointless in this case. Consequently, the doctrine of primary jurisdiction does not deprive the Court of jurisdiction over this cause of action. *See Kelley v. WMUL–TV,* No. 80–3282 (S.D.W.Va. Oct. 16, 1980).[3]

### STANDING

The defendants' final procedural objection is that the plaintiffs do not have standing to maintain the present suit. The essence of the standing question, the Supreme Court has pronounced, "is whether the plaintiff has alleged such a personal stake

---

**3.** In *Kelley,* a closely analogous case involving a television station owned and operated by an agency of the State of West Virginia, the United States District Court for the Southern District of West Virginia stated: "Inasmuch as the court perceives neither special expertise in the FCC in handling constitutional claims against state governments (areas in which the courts are experienced), nor an administrative remedy which would redress plaintiff's alleged injuries, the Court holds that the doctrine of primary jurisdiction does not apply and the case is properly before this court."

in the outcome of the controversy [as] to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 1343 (1975), quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) (emphasis in original). *See also Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). To determine whether the requisite "personal stake" is present, the Supreme Court has established a two-part test. First, the Court must examine whether the plaintiffs allege "a distinct and palpable injury." *Warth, supra,* 422 U.S., at 501, 95 S.Ct. at 2206. "The plaintiff must show that he himself is injured." *Arlington Heights, supra,* and "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth, supra,* at 499, 95 S.Ct., at 2205. Second, the Court must assure itself that the injury suffered is "fairly traceable to the defendant's acts or omissions," *Arlington Heights, supra,* 429 U.S., at 261, 97 S.Ct. at 561; *see also, Duke Power Co. v. Carolina Environmental Study,* 438 U.S. 59, 98 S.Ct. 2620, 2630–31, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976); and *O'Shea v. Littleton,* 414 U.S. 488, 498, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974), "or, put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power, supra,* 98 S.Ct. at 2631.

■ The plaintiffs have little difficulty in meeting both parts of this test. To begin with, the plaintiffs contend that the actions of the defendants deprived them of their right to view a program which they were constitutionally entitled to see. "It is now well-established," the Supreme Court stated in *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969), "that the Constitution protects the right to receive information and ideas," as well as to convey them. "[F]reedom of speech and press," the Court said, *id.,* "necessarily protects the right to receive." *See also Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–1823, 48 L.Ed.2d 346 (1976); *Kleindienst v. Mandel,* 408 U.S. 753, 762–763, 92 S.Ct. 2576, 2581–2582, 33 L.Ed.2d 683 (1965); *Lamont v. Postmaster General,* 381 U.S. 301, 307–308, 85 S.Ct. 1493, 1496–1497, 14 L.Ed.2d 398 (1965) (Brennan, J., concurring); *Brooks v. Auburn University,* 412 F.2d 1171, 1172 (5th Cir. 1969). The plaintiffs in the present case are clearly asserting their rights to receive, not the "rights or interests of third parties." *Warth, supra.* In addition, there is little doubt that the plaintiffs' injuries are a direct result of the defendants' refusal to air "Death of a Princess." If the Court grants the mandatory injunction requested by the plaintiffs, the alleged violation of their constitutional rights will indisputably be redressed in full.

The defendants argue that the right to hear "presupposes," in some sense, the existence of "a willing speaker." *Virginia State Board of Pharmacy, supra.* As no such speaker is present here, the defendants say, the plaintiffs lack standing to maintain this suit. The defendants, however, are confusing what must be shown to prove standing and what must be shown to prove a violation; their objection goes to the merits rather than the standing question. The plaintiffs contend that their First Amendment right to receive information has been violated. Those rights are personal, and are separate from and independent of any other party's right to speak.[4] In order to obtain

---

4. The independent nature of the First Amendment right to receive information was highlighted by the Supreme Court in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). There the Court found it unnecessary to assess the rights of inmates to send letters since the censorship by prison officials infringed equally upon the First Amendment rights of the addresses. *Id.* at 408–409, 94 S.Ct. at 1808–1809. Similarly, the Court in *Virginia State Board of Pharmacy, supra,* found that the consumers First Amendment right to receive drug price information was independent of the nonparty advertisers' right to distribute

standing, the plaintiffs need only show that the alleged deprivation of their rights was caused by the defendants. *See Arlington Heights, supra.* However, in order to prove their case that those rights were, in fact, violated they must show that someone, somewhere was trying to say what they wanted to hear. Otherwise, the "prior restraint" of which they complain would constitute no "restraint" at all. The defendants' objections will be addressed in due course, but they do not prevent the plaintiffs from obtaining standing.

## THE HISTORICAL DEVELOPMENT OF PUBLIC TELEVISION

Before the merits of the parties' claims are addressed, it is important to review the regulatory structure of public television in order to place this cause of action in perspective. Although the issues in this case are novel, they stem quite naturally, it will be seen, from the historical development of public broadcasting.

When television was first introduced in this country, there was no such thing as public television. All entities that wished to broadcast over a particular channel, whether commercial or noncommercial in nature, submitted their applications to the Federal Communications Commission. The FCC, which regulated television and radio broadcasting under the Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.*, awarded the license to the applicant which it determined would best serve the "public interest, convenience and necessity." 47 U.S.C. § 309(a).[5] Although the FCC did not focus on whether the applicant was a commercial or noncommercial entity, the result of this open competition was that only one

of the first 108 stations—WOI–TV in Ames, Iowa—was licensed to a noncommercial applicant—Iowa State College—and only then because no one else was interested in operating a television station in central Iowa in the late 1940's. Blakely, *supra*, at 1, 5.

Shortly after licensing WOI–TV, the FCC, on September 29, 1948, instituted a freeze on the processing of applications for television licenses. *Id.* at 1. The freeze was spurred by reasons unrelated to the licensing of WOI–TV and the development of public broadcasting, *id.*, but that did not prevent educators who wanted to operate television stations from making the most of it. These educators, who "had learned from experience with AM radio that they needed channels reserved specifically for noncommercial stations because they could not compete for licenses with commercial broadcasters in the open market," *id.* at 1–2, put their case before the FCC. On April 24, 1952, before the freeze was lifted, the FCC responded. It issued its "Sixth Report and Order," temporarily reserving 242 television channels out of a total of 2053, slightly more than 11 percent, for noncommercial educational broadcasting. Chester, Garrison, and Willis, *Television and Radio* 211 (1978). Later that year, the FCC increased the number of channels reserved and, in 1953, it made the reservations permanent. Blakely, *supra*, at 3. Educational television, the forerunner of today's public television, was, for the first time, a reality.

The reservation of specific channels for noncommercial educational television, however, did not sufficiently alleviate the problem of a chronic shortage of money which

such information. *Id.*, 425 U.S. at 756–757, 96 S.Ct. at 1822–1823. These and other cases, *see* cases cited in *Virginia State Board of Pharmacy, supra* at 757, 96 S.Ct. at 1823, make clear that the right to receive information is sufficient, at a minimum, to give a plaintiff standing and allow that person to show, at a hearing on the merits, that a willing speaker exists.

5. Communication in the United States, in keeping with the First Amendment's protection of freedom of speech, had traditionally been unregulated. Television and radio, however, un-

like the print media, utilize the electromagnetic spectrum, in which there is "a fixed natural limitation upon the number of stations [that can] operate without interfering with one another." *National Broadcasting Company v. United States*, 319 U.S. 190, 213, 63 S.Ct. 997, 1008, 87 L.Ed. 1344 (1943). For that reason, regulation of radio and television broadcasting was deemed appropriate. *See id.; Red Lion Broadcasting Company, supra*, 395 U.S., at 376–377, 89 S.Ct., at 1799–1800.

plagued the early noncommercial educational television stations. Throughout the 1950's and the early 1960's, "[o]nly repeated financial transfusions from the Ford Foundation prevented the whole system from collapsing." *The Broadcast Industry* 202 (R. Stanley, ed. 1975). In 1962, Congress passed the Educational Television Facilities Act, 47 U.S.C. §§ 390–397, since amended, "to assist (through matching grants) in the construction of educational television broadcasting facilities," 47 U.S.C. § 390, but it soon became clear that, if noncommercial television was to survive, the federal government would have to play a larger role in financing it. The turning point, five years later, was the issuance of the landmark Carnegie Commission report.

In November, 1965, the Carnegie Corporation had formed a Commission on Educational Television to "conduct a broadly conceived study of noncommercial television" and to "recommend lines along which noncommercial television stations might most usefully develop during the years ahead." Blakely, *supra*, at 169. In January, 1967, the Commission issued its report. *Id.* at 175. Entitled *Public Television: A Program for Action* (hereinafter *Carnegie Report*), the report, as is stated in its introduction, "separated educational television programming into two parts: (1) instructional television, directed at students in the classroom or otherwise in the general context of formal education, and (2) what we shall call Public Television, which is directed at the general community . . . [and which] includes all that is of human interest and importance which is not at the moment appropriate or available for support by advertising, and which is not arranged for formal instruction." For the former, it recommended further study. *Carnegie Report*, at 9. For the latter, which it explained, "is not the educational television that we now know," *id.* at 4, it recommended massive federal funding. *Id.* at 5–9.

The report, it should be noted, did not advocate direct federal funding of public television by Congress. It recognized that "[t]here is at once involved the relation between freedom of expression, intimately and necessarily a concern of Public Television, and federal support." *Id.* at 37. It recommended, therefore, that Congress establish a "federally chartered, nonprofit, nongovernmental corporation, to be known as the 'Corporation for Public Television,' " *id.* at 5, through which federal funds were to be channelled. It made clear, furthermore, that the "Corporation [was to] exist to serve the local station but [not to] operate it nor control it." *Id.* "The local stations must be the bedrock upon which Public Television is erected," the report stated, at 36, "and the instruments to which all its activities are referred." While the Corporation was to fund public television programs, "each station [was to] decide whether and when" to use them. *Id.* at 5.

Congress responded almost immediately with the Public Broadcasting Act of 1967. 47 U.S.C. § 390–399, since amended. The Act, which adopted many of the Carnegie Commission's suggestions, authorized a study of instructional television while appropriating federal monies for the funding of public television. *See* S.Rep.No.222, 90th Cong., 1st Sess., *reprinted in* [1967] U.S. Code Cong. & Ad.News 1772, 1793–1794. Public television stations, according to the Senate report to the Act, were "to provide educational, cultural, and discussion programs which [would] serve the general community." *Id.* at 1782. "The program[m]ing of these stations," the Senate Report said, *id.* at 1777, "should not only be supplementary to but competitive with commercial broadcasting services."

Congress was, of course, aware that federal funding brought with it the danger of governmental content control. As the Carnegie Commission had suggested, "to minimize the likelihood that [governmental] scrutiny [would] be directed toward the day-to-day operations of the sensitive program portions of the Public Television system," *Carnegie Report*, at 37, it

> authorized creation of the Corporation for Public Broadcasting, "a nonprofit corporation . . . which [would] not be an agency or establishment of the United States

Government," [47 U.S.C. § 396(b)] as a funding mechanism for virtually all activities comprising noncommercial broadcasting.

*Network Project v. Corporation for Public Broadcasting*, 561 F.2d 963, 973 (D.C.Cir. 1977), *cert. denied*, 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978). Congress took steps to insulate the Corporation from political control. *See*, 47 U.S.C. §§ 396(c)(1) and (*l*)(1)(A); 47 U.S.C. § 398(a); *Accuracy in Media, supra*, at 295. It also took steps, however, as the Carnegie Commission had recommended, to insulate the local stations from the Corporation's control. "It should be remembered," the Senate Report echoed, at 7, "that local stations are the bedrock of this system." Thus, although it was the Corporation's duty to "assist in the establishment and development of one or more interconnection systems" to enable public television to become national in scope, the Corporation was not permitted to own or operate the "interconnection system" itself. 47 U.S.C. § 396(g)(3). In order to fulfill its purpose, the Corporation had to establish another independent organization to act as an "interconnection system."

That organization was the Public Broadcasting Service (PBS). Established by the Corporation in November, 1969, "PBS was not to produce programs but was to help [the Corporation] and the Ford Foundation develop among the major production centers suitable programs which PBS would distribute by interconnection." Blakely, *supra*, at 200. It began operations in October, 1970, selecting the shows to be offered nationwide, scheduling them, promoting them, and distributing them. *Id.* at 203. PBS provided a service to the local stations, but was structured so as not to infringe upon their freedom to show what they wanted. The local stations were still free to decide when and whether to show the programs distributed by PBS. *Id.* at 200.

Within a few years, however, it became clear that even this level of involvement by PBS in determining what was to be shown was unacceptable. The local stations, it was true, had the right to accept or reject what PBS offered, but if they were to be part of a national public television system, they had to show what PBS offered. PBS, in other words, was determining the content of the programs shown on national public television. To remedy this situation, in 1974, the Station Program Cooperative (SPC) was formed. The operation of the SPC has been discussed earlier in this opinion. What must be emphasized at this point is the purpose for which the SPC was formed: *the prevention of governmental content control of programs broadcast on public television stations.* Through this mechanism, PBS, the recipient of federal funds, was effectively relieved of its control over programming content. The local television stations could, as they had never done before, actually determine the programming content of national public television. There was only one problem with this solution: the "bedrock" was constructed of quicksand. Although no one seemed to notice, the local stations were, in many instances, owned and operated by state and local governments.

There were two explanations for this fact. First, the development of television was greatly influenced by the development of radio which preceded it. It was therefore only natural that colleges and universities such as Iowa State College, which had been involved in the development of radio since its very beginning, *see* Blakely, *supra*, at 5, 35, would play a similar role in the development of television. If the colleges and universities happened to be affiliated with the State, that, at the time, seemed of no great moment. Second, prior to 1967, when the Carnegie Report was issued and the Public Broadcasting Act was passed, public television, it must be remembered, was "educational" television. As "public education in our Nation is committed to the control of state and local authorities," *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), it was only proper that educational television stations were licensed to those authorities. Of the 124 educational stations on the air in late 1966, 84 were owned and operated by state and local government entities. *Carnegie Report*, at 21–22.

When "educational" television became "public" television in 1967, the justification for state and local government ownership and operation disappeared. The state and local government owned and operated stations, however, continued to exert a profound influence on public television in this country. Although private parties can and do own and operate public television stations, "of the approximately 285 public television stations in this country [today] 132 are licensed to state or municipal instrumentalities and 77 are licensed to colleges or universities, most of whom [sic] are affiliated with government." *Brief of PBS*, at 5. These stations, moreover, as has been discussed, have been given increasing responsibility for programming. The possibility of government content control from above has appeared so ominous that the possibility of government content control from below has been entirely overlooked. This case is a direct result of that oversight. In effect, with state and local governments firmly entrenched as gatekeepers to the public's access to information, the fox has been asked to guard the henhouse.

## GOVERNMENT TELEVISION STATIONS AS PUBLIC FORUMS

█ The plaintiffs contend that KUHT–TV, which the parties have stipulated is a "governmental entity" for the purposes of First Amendment analysis, is a "public forum." *See Southeastern Promotions, Ltd. v. Conrad, supra*, 420 U.S., at 552, 95 S.Ct., at 1243 (1975); *CBS v. DNC, supra*, 412 U.S., at 140, 93 S.Ct., at 2105 (Stewart, J., concurring); *id.* at 193–196, 93 S.Ct., at 2132–2134 (Brennan, J., concurring). This, they say, "is the decisive point of the entire constitutional issue." *Plaintiff's Reply Brief*, at 10. If KUHT–TV is a public forum, then the defendants' decision not to air "Death of a Princess" on the station constituted, the plaintiffs maintain, a constitutionally prohibited "prior restraint." *See Conrad, supra*, 420 U.S., at 556, 95 S.Ct., at 1245. The defendants and *amicus curiae* deny that KUHT–TV is a public forum. They say that KUHT–TV is a licensee under the Communications Act of 1934, and,

as such, is both free and obligated to make programming decisions, including content based decisions, on the basis of its own judgment. They maintain that the First and Fourteenth Amendments place no limits whatsoever on a government owned and operated television station's exercise of editorial discretion.

The public forum doctrine grew out of those cases in which state and local governments attempted to limit expressive activities on certain property owned by the government. Facing the issue initially in *Davis v. Massachusetts*, 167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71 (1897), the Supreme Court held that the government was free to do what it wanted with its property. "For the legislature absolutely or conditionally to forbid public speaking in a highway or public park," the Court said, "is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house." *Id.* at 47, 17 S.Ct. at 733. Although that view lasted for quite some time, Justice Roberts, writing in *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1936), explicitly rejected it. The government, Justice Roberts said, was not as free as private persons to do what it wished with its property.

We have no occasion to determine whether, on the facts disclosed, the Davis Case was rightly decided, but we cannot agree that it rules the instant case. Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; ... but it must not, in the guise of regulation, be abridged or denied. 307 U.S. 515–516, 59 S.Ct. at 964.

Justice Roberts' concurring opinion in *Hague v. CIO, supra,* was not joined by a majority of the Court, but the principles he expressed therein soon were. In a long series of opinions, the first of which, *Schneider v. State of New Jersey,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), was authored by Justice Roberts with only one Justice dissenting, the Court invalidated government attempts to regulate expressive activities in public parks, city streets, or public ways when the regulations involved were related to the content of the expressive activities taking place. *See Schneider, supra; Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Staub v. City of Baxley,* 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Police Department of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Such places, the Court held, were "public forums" [6] and "[s]elective exclusions from a public forum," the Court said, "may not be based on content alone, and may not be justified by reference to content alone." *Mosley, supra,* 408 U.S., at 96, 92 S.Ct., at 2290.

Since its birth in Justice Roberts' concurrence in *Hague v. CIO, supra,* the public forum doctrine has grown to encompass many areas which have not, "time out of mind," been used for "purposes of assembly, communicating thoughts between citizens, and discussing public questions." It has been applied to bus terminals, *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968) *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); airports, *Chica-*

*go Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir. 1975), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); high school auditoriums, *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973); public libraries, *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); shopping centers, *Amalgamated Food Employees v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); welfare offices, *Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2d Cir. 1974); and the visitor recognition period of public school board meetings. *Princeton Education Association v. Princeton Board of Education,* 480 F.Supp. 962 (S.D.Ohio, 1979).

A recent public forum case heavily relied upon by the plaintiffs is *Conrad, supra.* In *Conrad,* the Supreme Court addressed the question of whether the members of a municipal board in Chattanooga, Tennessee, could refuse to allow the rock musical "Hair," to be performed in a city auditorium and a city-leased theatre. The board had determined that performance of the musical was not "in the best interest of the community." *Id.* 420 U.S., at 548–549, 95 S.Ct., at 1241. The Supreme Court held that the board's decision was an unconstitutional prior restraint. The auditorium and the theatre, the Court stated, "were public forums designed for and dedicated to expressive activities. There was no question as to the usefulness of either facility for petitioner's production." *Id.* at 555, 95 S.Ct., at 1245.

Faced with a similar set of facts in *Southeastern Promotions, Ltd. v. City of West Palm Beach,* 457 F.2d 1016 (1972), United States Court of Appeals for the Fifth Circuit had reached a similar conclusion. "The crucial query," according to the Fifth Circuit, "is whether or not the partic-

---

**6.** While the phrase "public forum" had been used by the Supreme Court in rare instances prior to 1965, *see International Association of Machinists v. Street,* 367 U.S. 740, 796, 81 S.Ct. 1784, 1813, 6 L.Ed.2d 1141 (Black, J., dissenting) and 806 (Frankfurter, J. dissenting) (1961), the appellation only gained recognition after Harry Kalven articulated the public forum con-

cept in Kalven, "The Concept of the Public Forum and *Cox v. Louisiana,*" 1965 Sup.Ct. Rev. 1. The Supreme Court first used the phrase in a majority opinion in *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), in which Kalven's article is cited frequently.

ular public facility involved in this litigation constitutes an appropriate place for the exercise of First Amendment rights." *Id.* at 1019. The factors the Court considered in making that determination were the character and pattern of activity of the place, as well as its essential purpose and the population who make use of the facility. After applying these factors to the municipal auditorium involved, the Fifth Circuit found "it quite evident that this particular public facility is a highly appropriate site for First Amendment activities." *Id.*

Implicit in the cases cited above is that a public forum is a place that is (1) controlled by the government and (2) appropriate as a place for the communication of views on issues of political and social significance. *See* specifically *Wolin v. Port of New York Authority, supra; Albany Welfare Rights Organization, supra; City of West Palm Beach, supra.* There is no question that KUHT–TV is precisely such a place. First, it has been stipulated, as has been noted, that both KUHT–TV and the University of Houston are "governmental entities" for the purpose of First Amendment analysis. Second, as Justice Brennan stated in *CBS v. DNC, supra,* 412 U.S., at 194–195, 93 S.Ct., at 2132–2133 (dissenting opinion) (emphasis in original, footnote omitted):

> There can be no doubt that the broadcast frequencies alloted to the various radio and television licensees constitute appropriate "forums" for the discussion of controversial issues of public importance. Indeed, unlike the streets, parks, public libraries, and other "forums" that we have held to be appropriate for the exercise of the First Amendment rights, the broadcast media are dedicated *specifically* to communication. And, since the expression of ideas—whether political, commercial, musical, or otherwise—is the exclusive purpose of the broadcast spectrum, it seems clear that the adoption of a limited scheme of editorial advertising would in no sense divert that spectrum from its intended use.

This is all the more true for public television stations with their special emphasis on public affairs programming. (See discussion above.) In addition, if the historical usage of KUHT–TV is deemed relevant, a simple review of KUHT–TV's program guide, plaintiffs' Exhibit 4, reveals that KUHT–TV regularly communicates views on issues of political and social significance.

The defendants offer six reasons as to why KUHT–TV should not be held to be a public forum. First, the defendants say, the University of Houston, as a broadcast licensee, already has "an affirmative and independent statutory obligation to provide full and fair coverage of public issues." *CBS v. DNC, supra,* 93 S.Ct. at 2100, and for that reason this Court should impose no further obligations to provide the plaintiffs with access to their station. It is true, of course, that under the Communications Act of 1934 licensees have certain obligations and that those obligations may have some influence on the issues in this case. They do not, however, resolve those issues. The question here is what constitutional, rather than statutory, obligations are imposed on the University of Houston and KUHT–TV.

Second, the defendants contend that to declare KUHT–TV a public forum would be to render it a "common carrier" and that § 3(h) of the Communications Act specifically provides that "a person engaged in ... broadcasting shall not ... be deemed a common carrier." 47 U.S.C. § 153(h). *See Federal Communications Commission v. Midwest Video Corporation,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). However, 47 U.S.C. § 153(h), is a statutory definition. It was not intended to be, nor is it, a statement by the Congress as to how the constitution is to be interpreted. Furthermore, a "common carrier," as defined in the Communications Act has specific rules and regulations governing its conduct. *See* 47 U.S.C. § 201 *et seq.* While a television station which is found to be a public forum may well be the functional equivalent of a common carrier, *see CBS v. DNC, supra,* 412 U.S., at 140, 93 S.Ct., at 2105 (Stewart, J., concurring), it is not at all clear that the standards of conduct of the latter apply to the former. Thus, a finding that KUHT–TV is a public forum does necessarily re-

quire that it be "deemed" a common carrier. Finally, if a finding that KUHT–TV is a public forum would come into conflict with 47 U.S.C. § 153(h), it is that section which would have to yield. It is the Constitution of the United States, not the Communications Act of 1934, which is the supreme law of the land.

The defendants' third argument is somewhat related to its second. KUHT–TV, defendants assert, particularly because it is a public television station, is required by the Communications Act to exercise its own editorial discretion. To hold that it is a public forum, the defendants maintain, would deprive it of most, if not all, of that discretion. This argument like the preceding one, is subject to the criticism that it places the Communications Act above the Constitution. Moreover, as has been noted earlier, the entire reason for the placement of control over programming in the hands of local public television stations was the fear that the government would control the programming content. To say that the passage of the Public Broadcasting Act of 1967 and the establishment of CPB, PBS, and the Station Programming Cooperative were intended to require the government to exercise content control over public television programming is to ignore both the historical development of and the fundamental purposes behind those events.

The defendants' fourth argument is, in effect, that KUHT–TV should not be declared a public forum because it has not been operated as one in the past. The argument is encapsulated in the defendants' letter to the Court of August 25, 1980. In that letter, at 1, the defendants argue as follows:

> State ownership and control do not make an instrumentality a public forum. Obviously, a judge's chambers and private government offices are not public forums. The key is the public's right of access and, clearly there is no public right of access to programming on KUHT–TV.

This argument, however, ignores the case law on the public forum doctrine. Contrary to the defendants' contention, the key is not the public's right of access. As the Fifth Circuit said in City of West Palm Beach, supra, at 1019, "[t]he crucial inquiry is whether or not the particular public facility involved in this litigation constitutes an appropriate place for the exercise of First Amendment rights." A determination of whether judge's chambers and private government offices are public forums turns on whether or not they are "appropriate place[s] for the exercise of First Amendment rights," not whether or not the public has a right of access to these places.

The defendants' fifth argument is that to declare KUHT–TV a public forum would be to ignore the "unusual order of First Amendment values," CBS v. DNC, supra, 412 U.S., at 106, 93 S.Ct., at 2088, presented by television broadcasting. The Court is, of course, aware that the "differences in the characteristics of [broadcasting] justify differences in the First Amendment standards applied to [it]." Red Lion Broadcasting Company, supra, 395 U.S., at 386, 89 S.Ct., at 1805. It is the special characteristics of broadcasting—the natural limitation on the number of stations that can effectively communicate at any one time—that justifies the placement of limitations on the traditionally free exercise of First Amendment activities by broadcast licensees. That characteristic in no way, however, justifies the total elimination of the First Amendment prohibition against government content control of free speech in America.

The defendants' argument seems to boil down to the contention that television is so powerful a medium that it cannot be declared a public forum. As the Supreme Court said in Federal Communications Commission v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978), the broadcast media have established "a uniquely pervasive presence in the lives of all Americans." That, however, is an argument for declaring KUHT–TV a public forum, not an argument against it. The more powerful and pervasive a communications medium, the more dangerous the spectre of government content control. As the

Supreme Court said in *Conrad, supra*, 420 U.S., at 557–558, 95 S.Ct., at 1246,

> each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.... [T]he basic principles of freedom of speech and the press, [however,] like the First Amendment's command, do not vary. Those principles, as they have frequently been enunciated by this Court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule.

The defendants' sixth and final argument against declaring KUHT–TV a public forum, citing *CBS v. DNC, supra*, is that the programming decisions of KUHT–TV and the University of Houston themselves are protected by the First Amendment. *CBS v. DNC*, however, underminds, rather than supports, the defendants' argument. In *CBS v. DNC*, the Supreme Court was faced with the question of whether a private broadcast licensee's refusal to accept editorial advertisements urging controversial positions violated the First Amendment. A clear understanding of the holding is made somewhat difficult by the presence of six different opinions, none of which express a majority view in its entirety. A clear majority did, however, conclude that the private broadcaster in that case, CBS, did not violate the First Amendment in refusing the advertising offered by DNC. Chief Justice Burger, writing for himself, Justice Stewart, and Justice Rehnquist, held that CBS's actions did not constitute "governmental action" for the purposes of the First Amendment. Writing for the Court, Chief Justice Burger then addressed "the question whether the 'public interest' standard of the Communications Act requires broadcasters to accept editorial advertisements or, whether, assuming governmental action, broadcasters are required to do so by reason of the First Amendment." *Id.* 412 U.S. at 121, 93 S.Ct., at 2096. He concluded, *Id.* at 124–125, 93 S.Ct., at 2097–2098, that CBS was not required to accept DNC's advertising.

The defendants rely quite heavily on the latter portion of the Court's opinion. Under the Communications Act, they say, KUHT–TV and the University of Houston are editors, and, "[f]or better or worse, editing is what editors are for," quoting *CBS v. DNC, supra* at 124, 93 S.Ct., at 2097. However, the defendants fail to fully appreciate the context in which this statement took place. It is true that Chief Justice Burger assumed that governmental action was present for the purpose of his subsequent discussion of the application of the public interest standard. That assumption, however, was premised upon the fact that the editorial decision at issue was that of a private broadcasting company. *See Mississippi Gay Alliance v. Goudelock*, 536 F.2d 1073, 1083 (5th Cir. 1976); Canby, "The First Amendment and the State as Editor: Implications for Public Broadcasting," 52 Tex.L.Rev. 1123 (1974). A review of *CBS v. DNC* leaves little doubt that had a government owned and operated television station been involved, a different result would have been reached. To begin with, Chief Justice Burger, himself, in a portion of his opinion joined in by Justices Rehnquist and Stewart, wrote as follows:

> Were we to read the First Amendment to spell out governmental action in the circumstances presented here, few licensee decisions on the content of broadcaster or the processes of editorial evaluation would escape constitutional scrutiny.... Journalistic discretion would in many ways be lost to the rigid limitations that the First Amendment imposes on government .... The concept of private, independent broadcast journalism, regulated by government to assure protection of the public interest, has evolved slowly and cautiously over more than forty years and has been nurtured by processes of adjudication. That concept of journalistic independence could not coexist with a reading of the challenged conduct of the licensee as governmental action.

The existence of KUHT–TV, it should be noted, does not comport with "the concept of private, independent, broadcast journalism."

Other members of the Supreme Court voiced concerns similar to those expressed by Chief Justice Burger. Justice Stewart, in his concurring opinion, objected strenuously to the suggestion that the action by CBS was "governmental action," recognizing how different the outcome would be were it found to be so. "Were the government really operating the electronic press," stated Justice Stewart, "it would ... be *prevented* by the First Amendment from selection of broadcast content and the exercise of editorial judgment." *CBS v. DNC, supra,* 412 U.S., at 143, 93 S.Ct., at 2106 (emphasis in the original). "To hold that broadcaster action is governmental action would thus simply strip broadcasters of their own First Amendment rights. They would be obligated to grant the demands of all citizens to be heard over the air, subject only to 'time, place and manner.'" *Id.* at 139, 93 S.Ct., at 2105.

Justice Douglas, in his own concurrence, was most emphatic on this point. "If a TV or radio licensee were a federal agency, the thesis [that a licensee's decisions are government actions governed by public forum analysis] would inexorably follow." Such "a licensee, like an agency of the Government, would within limits of its time be bound to disseminate all views. For, being an arm of the Government, it would be unable to by reason of the First Amendment to 'abridge' some sectors of thought in favor of others." *Id.* at 150, 93 S.Ct., at 2110.

Justice Brennan's dissent, joined in by Justice Marshall, argued that CBS itself should be considered a public forum. *Id.* at 170–204, 93 S.Ct., at 2120–2138. The Court notes that if one accepts that CBS is a public forum, there can be little doubt as to the status of KUHT–TV.

This Court has discussed at length the various opinions in *CBS v. DNC.* Such close scrutiny is warranted, however, because the defendants contend that that case establishes that it is KUHT–TV, not the plaintiffs, who are protected by the First Amendment in the present case. And this Court is convinced that *CBS v. DNC,* more than any other case cited by any of the parties, establishes the opposite proposition. *See Kelley v. WMUL–TV, supra.*[7] But see *Muir v. Alabama Television Commission,* No. 80–G–0607–S (N.D.Ala. July 3, 1980).[8]

The defendants' argument, in the final analysis, is based on a fundamental misunderstanding of the purposes of the Bill of Rights. The defendants stipulate that KUHT–TV and the University of Houston are "governmental entities," but then insist that the First Amendment does not apply to their activity. If KUHT–TV and the University of Houston are governmental entities, the First Amendment must apply to their activities. The protection afforded by that Amendment extends not so much to KUHT–TV's editorial decisions as it does to the right of viewers to be free of governmental control over the content of programs presented to them. The purpose of the First Amendment, as with the Bill of Rights in its entirety, is to protect the people from government, not government from the people. *See CBS v. DNC, supra,* 412 U.S., at 139 n.7, 93 S.Ct., at 2105 n.7 (Justice Stewart, J., concurring). On the basis

7. The United States District Court for the Southern District of West Virginia reached the same conclusion in finding governmental action present where the licensee was defendant West Virginia Educational Broadcasting Authority (WVEBA), an agency of the government of the State of West Virginia. On this basis it distinguished *CBS v. DNC,* and held the First Amendment applicable to the licensee's actions. While the district court defined the "public forum" in that case to be limited to the televised political debate originally scheduled by the defendants to include the Republican and Democratic, but not the Libertarian, candidates for governor, this Court finds the logic of that decision persuasive for the proposition that the "public forum" concept is broad enough to include the state owned and operated television station itself. Unlike the instant action, the district court in *Kelley* was simply not required to go that far under the unique set of facts in that case.

8. The United States District Court for the Northern District of Alabama has reached a different result on the basis of a similar set of facts. With all due respect, this Court takes a different view of the law in this case.

of these constitutional considerations the Court finds that KUHT–TV, a government owned and operated TV station, is a public forum.

### THE EXISTENCE OF A PRIOR RESTRAINT

Having determined that KUHT–TV is a public forum, the defendants' objections regarding the lack of a willing speaker in the present case become relevant. KUHT–TV's status as a public forum means that decisions not to show programs on it may be challenged as prior restraint. It does not mean that decisions not to air programs on it are definitionally prior restraints. A restraint, prior or subsequent, can only exist where there is someone who is willing to speak. *See Virginia State Board of Pharmacy, supra,* 425 U.S. at 756, 96 S.Ct., at 1822.

The defendants maintain that the University of Houston is properly to be viewed as the speaker in this case. As licensee of KUHT–TV, the defendants maintain, the University is obligated under the Communications Act to decide which programs will, in its estimation, best serve the public interest. That statutorily prescribed role as program selector, the defendants argue, qualifies it for the role of "speaker." As the University is not, without question, a "willing" speaker, the defendants maintain that the present case involves no prior restraint. The defendants insist that this action merely represents an attempt by the plaintiffs to force an unwilling speaker to speak.

The plaintiffs take the position that PBS is the speaker. PBS is the entity which distributed "Death of a Princess" for airing on KUHT–TV and other public broadcasting stations across the country. It advertised the showing of "Death of a Princess" and distributes the entire "World" series, of which "Death of a Princess" is simply one part. PBS distributed the program for airing and KUHT–TV refused to televise it. In the plaintiffs' view, that makes PBS a willing speaker and KUHT–TV the implementor of a prior restraint.

The Court accepts the analysis of neither the plaintiffs nor the defendants on this point. The requirements of the Communications Act do not make the University of Houston the speaker. At best, these requirements make it an editor of the works of other speakers and, has been noted, its editorial discretion is limited by the application of the First Amendment. PBS, similarly, is not the speaker. Its charter and the Public Broadcasting Act of 1967 make clear that it is intended to be a distribution mechanism only. It was once the major program selector, but that role has since been limited by the institution of the SPC. Moreover, even as program selector it originated no programs whatsoever and by now it is specifically prohibited by law from doing so. As operator of the power lines which bring programs to public stations, PBS acts merely as a middle man between the true speaker and the forum, KUHT–TV.

The true speaker, then, is the party or parties who originated the programming in question. It is their thoughts that are expressed in the program; it is their "speech" that is intended to be heard. WGBH Educational Foundation of Boston, Massachusetts, and ATV network of London, England, produced "Death of a Princess." It was their "speech" and it is clear that they wanted it to be "heard."

This conclusion is by no means weakened by virtue of the fact that the University of Houston, through the SPC mechanism, paid the producers of a "Death of a Princess" for the rights to broadcast their show. That payment, in and of itself, did not give the University the right to prevent the show from being aired. Courts have repeatedly held that "[t]he state is not necessarily the unrestrained master of what it ... fosters." *Bazaar v. Fortune,* 476 F.2d 570, 575 (5th Cir. 1973) quoting *Antonelli v. Hammond,* 308 F.Supp. 1329, 1337 (D.C.Mass. 1970).

Illustrative of this point is *Brooks v. Auburn University, supra.* There, the United States Court of Appeals for the Fifth Circuit affirmed a lower court's order restrain-

ing the Auburn University president from preventing the Reverend William Sloan Coffin from appearing and speaking on campus after he had been properly invited by a student organization. The Fifth Circuit's decree also required the University to pay Reverend Sloan an agreed honorarium and travel expenses. Such expenses certainly did not make the University the speaker. As the district court stated, while Auburn was not required to allocate funds—either student fees or public funds—to pay invited speakers, "[h]aving allocated the money . . . and having paid other speakers with no questions asked, Auburn may not in this instance, for no constitutionally acceptable reason, withhold the funds for the Reverend Mr. Coffin as a censorship device." *Brooks v. Auburn University*, 296 F.Supp. 188, 198 (M.D.Ala. 1969).

Similarly, in the instant case the University may have paid the show's producers; it certainly did not, by that payment, become them. Nor did the fact that a payment was involved convey to the University any greater right than it otherwise had to refuse to show the program on the basis of its content. As the cases indicate, the University of Houston is not obligated to own this public forum. It need not purchase programs to show on this public forum. But if it decides to do so, it cannot refuse to show such programs on the basis of the views they represent. As the Supreme Court has said, "above all else, .the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of City of Chicago v. Mosley, supra*, 408 U.S., at 95, 92 S.Ct., at 2290.[9]

WGBH Educational Foundation and ATV network of London created and produced "Death of a Princess" and, through the SPC

mechanism offered the rights to broadcast it to the University of Houston. The University of Houston bought those rights, but refused to show the program on KUHT–TV, the public forum television station which it owned and operated. That action, the defendants admit, was based on the content of the program. Consequently, as the Supreme Court has made clear, *see Conrad, supra*, 420 U.S., at 552–558, 95 S.Ct., at 1243–1246, that action must be labeled a prior restraint.

## THE INVALIDITY OF THE PRIOR RESTRAINT

Although the fact that the decision not to show "Death of a Princess" constituted a prior restraint "does not end the inquiry," *Conrad, supra*, at 559, 95 S.Ct., at 1246, it does place an extremely heavy burden on the defendants. "Any system of prior restraint of expression comes to this Court bearing a heavy presumption against its constitutional validity." *New York Times Company v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). The defendants in the present case have failed to overcome that presumption.

In order for a prior restraint to be lawful, it must fulfill certain substantive and procedural requirements. It "first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, and, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Conrad, supra*, 420 U.S. at 559, 95 S.Ct., at 1247. The

---

**9.** Even if the payment by KUHT–TV somehow made a difference and in effect rendered the station the "unwilling speaker" which it claims to be, that analysis might forestall, but would not entirely foreclose, this Court's conclusion that KUHT–TV has engaged in prior restraint in refusing to air a program because of its content. The same issues would arise if the

producers of "Death of a Princess"—or any other "controversial" show—offered their program for free. Far from being an unlikely scenario, the determination of whether or not to air programs other than those produced or paid for directly by KUHT–TV presents a problem that is bound to arise with disturbing regularity.

restraint at issue in the present case fails to meet either requirement.

The only conceivable exception which the decision not to show "Death of a Princess" might arguably fit is the national security exception discussed in *New York Times Company v. United States, supra.* As the Supreme Court first stated in *Near v. State of Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) (dictum), in time of war "[n]o one would question but that a government might prevent actual obstruction of its recruiting service or the publication of sailing dates of transports by the number and location of troops." Dr. Nicholson testified numerous times that his major reason for cancelling the showing of "Death of a Princess" was his concern that airing the show might "exacerbate the situation" in the Middle East. He was asked repeatedly to explain precisely what he meant by this phrase and was entirely unable to do so. The showing he made in regard to the national security exception was unacceptable as a matter of law. The Court cannot ignore the fact that "Death of a Princess" was aired in most of the other 285 public television stations as originally scheduled. Notwithstanding those showings, Dr. Nicholson, with the benefit of the 20/20 vision which hindsight affords, was unable to explain how the airing of "Death of a Princess" could have threatened this nation's national security.

Of course, even if the showing of "Death of a Princess" had, in fact, involved a threat to the national security, the prior restraint imposed in this case would not meet constitutional standards because it was not accomplished with the procedural safeguards required by the First Amendment. The defendants did not meet their burden of instituting judicial proceedings and proving that the material was in fact dangerous to the national security. The restraint imposed prior to judicial review was not imposed only for a specified brief period of time for the purpose of preserving the status quo. Neither was a prompt, final judicial determination assured. *See Conrad, supra,* 420 U.S. at 558–563, 95 S.Ct., at 1246–1248. It was, therefore, invalid on both procedural and substantive grounds.

## CONCLUSION

The issue which has been presented to the Court, simply stated, is whether a state, albeit operating in the capacity of a state owned and operated television station, is somehow excused from recognizing the protections of the First Amendment. The Court refuses to carve out such an exception to the Bill of Rights. To do so would in effect encourage the planting of seedlings which, upon attaining full growth, would install the State of Texas, through its University of Houston, as a kind of "Ministry of Truth" as portended in George Orwell's *1984. See* Orwell, *1984* (Harcourt & Bruce 1949). Such absolute control over what the people may see and hear will not be countenanced in 1980.

This decision should not be viewed as an attempt by this Court to thrust itself into the business of operating a television station. That business is properly reserved to those entities duly licensed by the FCC, yet it is a business which cannot be conducted in a constitutional vacuum. The operation of KUHT–TV, although perhaps now made more difficult by this decision, must be performed within the confines of the First Amendment. A balance must be struck and in this case the scales are weighted in favor of the First Amendment rights of persons who reasonably expect to view programs free of government censorship.

It cannot be emphasized enough that this is not a case involving the privately owned and operated media. Rather, this case involves an attempt by the state to control what people see and deprive them of their right to receive information. The people of this country have a First Amendment right to see and hear without having their sights and sounds subjected to the censorship of those wrapped in the cloak of the state, particularly when those state officials are acting on the basis of their personal, political predilections.

Having determined that the decision not to show "Death of a Princess" violated the constitutional rights of the plaintiffs in this

case, there is only one appropriate remedy—to order that the "Death of a Princess" be shown on KUHT–TV. Such an order, however, is not one which this Court takes lightly. No one is more aware than this Court of the dangers of a governmental official determining what can and cannot be said. But here a governmental official, in violation of the First Amendment, has already done that. After much deliberation it is the conclusion of this Court that the decision of Dr. Nicholson not to show "Death of a Princess," like the decision of the municipal board in *Conrad, supra*, not to show "Hair," must be overturned by judicial order.

The "Death of a Princess" was scheduled for viewing on May 12, 1980, at 8:00 p. m. That censorship, contrary to the very essence of the First Amendment prohibition against prior restraints, has now lasted for seven months. It must not be permitted to last any longer. KUHT–TV is hereby ORDERED to air "Death of a Princess" in its entirety within thirty (30) days of the date of this Order at a time comparable to that which was originally scheduled.